Good morning, Your Honors. My name is Nancy Miller. I represent Tennis Ismail in this matter. Fine. You may proceed. You have ten minutes. Let me help focus your argument, at least from my standpoint, and the other judges may have questions, too. I'm interested in two aspects about your client's case. One is the problem with his account of being on and off this tour boat when the passport stamps don't seem to corroborate the fact that he was on, then off, and then on. And the immigration judge placed quite a bit of weight on that. And the other is, on the other side, there were these two declarations submitted as witnesses to the beating he had somewhat earlier in his life. Ultimately, those were received in evidence, but the IJ never addresses those, and those two documents would seem to corroborate politically-inspired or ethnically-inspired beatings. So if you could address, at least when you're doing whatever your remarks are, both of those issues. Your Honor, I'll start by dealing with both of those issues. The testimony from Mr. Ismail regarding his work on the cruise ship, his work as the waiter — If you could speak up just a little bit, I'm having a little difficulty. I'm sorry. Mr. Ismail's testimony in court about his work as a waiter on the cruise ship dealt with whether or not — why he didn't have any stamps in his passport, except for the one time when he returned to Romania from England. He was a crew member on a cruise ship, and he oftentimes got off and got back on. Well, see, that isn't what he said, Your Honor. What he said was actually that he worked on the cruise ship and that most of the time he was required to stay on the cruise ship and continue to serve the people who were staying on there. And in fact, that's why he didn't have any stamps in his passport from the other countries that the ship had gone to. I think there were two exceptions. One was the one time in Greece, because when they entered the ship, he had to have a stamp in his passport to enter Greece, to enter onto the ship. And the other time was when he entered Romania, because he didn't come from the ship. He came from — he came from the airport in — he flew from England, and that's why he had the other stamp in his passport. The evidence is not absolutely clear as to when or how many other times he did actually get off the ship, although he did say the few times that he got off in Romania, he had just gotten off the ship and was not required to have a stamp in his passport. Well, let me just clarify then. He did get a stamp when he first got on board the ship from Romania. Isn't that correct? In April? He got a stamp for Greece. He got a visa for Greece. So when he first boarded the cruise ship out of Romania, he did not get a departure or a stamp at that point? I do not believe he did, and I don't — So the only stamp that confirms — what confirms the fact that he was on board ship back in April? The fact that he had the stamp in his passport. So who put the stamp up? From Greece. From Greece. From Greece. All right. So he did not get a Romanian stamp. The only Romanian stamp he had on his passport was when he came back in by air? I believe that that's true, Your Honor. Yes, I do. And that being the case, it would show that his passport obviously did not have a complete picture of if or when he did enter or are. And what's wrong with the IJ's interpretation of what a stamp meant? I mean, there's — you could interpret it the way the Petitioner wants to or the way that the IJ — you know, the problems the IJ had with it. What's wrong with the IJ? Part of — Is there evidence to support the IJ's conclusion or that that's an — you know, that it's — that it is — you know, goes to the heart of his claims, then — Well, I think if you go with the IJ's interpretation, then he was physically in other countries, and if he was in those other countries, why didn't he then go apply for asylum at those embassies in any of those countries, which is exactly what the IJ was saying in his decision. If he never left the ship and if he wasn't allowed to leave the ship because he was working, then he had no opportunity to go to apply for asylum anywhere else. He had no opportunity to go to the — to the U.S. Embassy. Whether or not that would have been effective, efficacious, I don't know. It's quite possible that it wouldn't have been, but nonetheless, that's the difference in the interpretations. Under Mr. Esmail's testimony, he didn't have the time, the ability, because he never left the ship. With regard to your second question, Your Honor, regarding the declarations, you're right. The IJ never did address those issues. He never addressed several issues with regard to credibility. There were five incidents of — of beatings and of abuse that Mr. Esmail testified to, the one in 93, 94, 95, 98, and 99. And we have corroborative testimony declarations from — from witnesses that were submitted who were there at the time that the beatings took place. One of these people even took him to the hospital when he was unconscious. The IJ did not deal with that. He didn't deal with — with any credibility issues with regard to most — to the 93, the 94, the 95, or the 98 beatings. He only dealt with the — with the issue of 99, and there he only dealt with it with regard to whether or not it took place, because there was a potential inconsistency with regard to was he actually on the ship at that point or was he working as a bartender in — in the — in the club in Romania. And yet if you look at Mr. Esmail's testimony, that isn't inconsistent, because he said that he was on the ship in April and May, and then he was back in Romania in June, July, and August, and then he went back onto the ship. Well, if he was beaten during the summer in Romania, under all of his testimony, he was in Romania. Whether he, in fact, was back and forth on the ship or not, during the summer, there's no inconsistency. He was in Romania in the summer of 99. Yes. Only in the sense that when he was being beaten, he was called Roma, that — that that was one of the insults against him. He isn't a gypsy, and we don't make any claim that he is gypsy. As I said, only in the sense that that is one example of — of — of the type of persecution that he received, in the sense that that's one of the names that he was given, or that he was called as he was being beaten. He was also called a stinking Turk. He was called a smelly Turk. He was called a lamb head. He was called many other things, and the country reports do, in fact, talk about the fact that — that Romania doesn't have a great record, at this point, of trying to defend or protect the rights of its national minorities, and he is clearly a national minority as both a Turk and as a Muslim. You want to save the balance of your time? I do, Your Honor. Yes, thank you. If I could, I'd like to perhaps address the questions which Your Honor has put to Mr. Ismail's attorney, because I think they do go to the heart of the government's defense of this action. The issue of — about Mr. Ismail's presence on or off the cruise ship in 1991,  the immigration judge did not focus just on whether that meant Mr. Ismail visited other countries or went ashore in other countries. The key issue there was whether he was, in fact, in Romania in July of 1999, when he said he was beaten, at least in one instance, by police. His testimony on that, at best, I think, could be called dissembling, perhaps, at worst, creative, as he was pressed on cross-examination. His answers regarding where he was — and the issue here also is that the immigration judge pointed out to Mr. Ismail. He had — he, the immigration judge, had trouble understanding where Mr. Ismail was during 1999. And the record on that is that under cross-examination, it was only on cross-examination that Mr. Ismail even brought out that he worked on the cruise ship for a number of months in 1999. At first, the immigration judge said that left the immigration judge with the impression that Mr. Ismail downplayed that part of his history. He was bothered by that because — in fact, in Romania in July, when the beating allegedly occurred — Although, in fact, his declaration did identify that he was employed on a cruise ship. He didn't make that up. If I could jump ahead, then, to the relevance of the declarations. At the master calendar hearing, prior to the full hearing, the immigration judge gave notice that he was bothered by the evidentiary basis of the two statements, if you will. They're not formal declarations. I'm not shifting. I'm talking about in his declaration. He identified his employment history as including the cruise ship. He said it wasn't brought up until cross-examination and somehow he was hiding the fact that he'd been on a cruise ship. The reason I stress that, Your Honor, and thank you for correcting me, is that in his direct examination, his attorney asked him three times what employment he held in Romania. And he identified he worked as a bartender, which occurred in 1999. And that he held odd jobs for different people, doing things such as cutting wood. His attorney asked him three times. Then, on cross-examination — Yes, that's right. That was the question. And because part of the issue, too, was, I guess, for persecution grounds, was he able to find gainful employment. But nonetheless, his attorney pressed that question three times. Then, on cross-examination, the government attorney asked the question. Then he said he worked on the cruise ship. Your Honor is correct. He listed on his asylum application that he worked on the cruise ship, I believe, in April and May of 1999. So then, on cross-examination, he does say yes, in fact. But then, his testimony went as follows. He said at first that he worked April and May 1999 on the cruise ship. Then he said maybe it was two months. And then he said he returned to Romania after a few months. Then he agreed with government counsel that the record indicated that he had been away from Romania for six months. He then said that he worked for a month on the cruise ship at first, and then later, but that in between, which would include the relevant period, July 1999, he was in Romania. On this record, then, the immigration judge was still left with confusion about where exactly Mr. Ismail was in the summer of 1999. Didn't all that line of questions kind of lead to an inference that, when he was asked, where did he work in Romania, that was his last question? I mean, was there any indication that he had done based employment and jobs in Romania, as opposed to being on a cruise ship that tied up and he got off on a frolic of his own, or whatever? There was no indication he was working for the cruise ship when he got on land. Your Honor, if we agree that that is a possible inference, nonetheless, that doesn't prevail under the standard that the court must apply. Even if any of us could find different readings of the evidence, it's not sufficient to overturn the immigration judge's decision unless the evidence compels that other conclusion. Okay. Now, in that regard, then, do you agree with the counsel for Mr. Ismail that the only stamp that shows him boarding the ship was issued by Greece, not by Romania? No. The page of his passport on which those stamps appear contain one for April 13th, 1999, a stamp from Romania at the frontier. It is then stamped on entry into Greece that same day, April 13th, 1999. Then the third stamp is departing Greece. The second stamp was entering Greece on April 13th, after leaving Romania. The third stamp on that same page in the same space in the visa area was for leaving Greece the next day, April 14th, 1999. The very next stamp in that same series of stamps shows him reentering Romania in October of 1999. And the significance of this is that's consistent with his statement, at least at one point, that he was away from Romania. For approximately six months, April to October 1999. And it is not, the immigration judge was not required to disregard that information, especially since Mr. Ismail both could not explain the stamps, and I submit dissembled regarding his actual locations. If he's gone six months, then that would mean that he wasn't, if you accept that, if you believe he's gone six months, if that's one way to look at it. Then he would be gone when one of the beatings occurred? In July of 1999. That's right, Your Honor. Yes. And that was significant. We believe that that, in and of itself, was enough reason for the immigration judge to have doubts about the credibility of the testimony. The immigration judge was not required to overlook the discrepancies about the beating allegedly occurring in October, in July 1999, simply because he didn't find weaknesses in the information. Provided by Mr. Ismail about the other beatings. Remember, all of the information pretty much comes from Mr. Ismail. Well, not all. Can you address the two corroborating declarations? Gladly, Your Honor. The two statements pertain to two individuals. One who stated in a declaration that he was present and witnessed a beating of a Turkish citizen in Romania by police in the summer of 1998. I believe the declarant's name was Mr. Costica. He says it's a Romanian citizen of Turkish nationality. That's right. He does not identify Mr. Ismail at all. And the second was a statement by a woman who claimed that in July 1999 she happened to be present when the police beat Mr. Ismail after he left a bar and took him to a hospital. When the statements were first presented by Mr. Ismail's counsel, the immigration judge put the parties on notice. He had a problem with them, and government counsel had objected because only the translations of the statements were provided initially. There was no statement, no evidence of the original statement. Well, I know that, but ultimately at the end of the day, the I.J. admitted them into evidence. He admitted them into evidence because government counsel relied on them to cross-examine. However, he said early and he said later that it would go to the weight he would give the documents. But we don't know what weight he gave them because he never addressed them. He gave them none, Your Honor. Well, how do we know that? Because he did not rely upon them. He gave several very specific... Well, but here you have two. You're arguing, well, there's an impeachable aspect of the Kostikopluskin one because it doesn't identify Ismail, and the other one specifically does a year later. So you have at least one that specifically identifies Ismail and talks about a bad beating with the epithets about stinking turd. And then you have the earlier one, which if true, would mean he's got two beatings corroborated. So that doesn't that weigh against the whole garbled stuff about whether he was also beaten in 1999 when you've got two corroborated beatings, which are entirely consistent with his being beaten and persecuted because of his Turkish ethnicity. We submit that they don't because of other testimony Mr. Ismail gave about the statements. But why... the I.J. didn't do any of this. The I.J. didn't address these at all. He admits them into evidence and then remains silent about them. So I have no idea why the I.J. didn't address them. He said early in the hearing that unless Mr. Ismail tied the statements, the translations, to the originals, he, the immigration judge, would not consider them. Mr. Ismail's testimony... But that was before he admitted them in evidence. Then he admits them in evidence. He admitted them into evidence, as I mentioned, because government counsel referred to them in cross-examining Mr. Ismail. But he also said, though, in his opinion, he said he would consider what weight to give documentary evidence. And he, the immigration judge, did not rely upon the documentary evidence for his opinion. Well, that's troublesome because one of the problems we have in so many of these cases is that there's no corroborating evidence. We're looking at the I.J. to say, you know, I looked into his eyeballs and watched his demeanor. He says he was beaten. I find other reasons to disbelieve it, the cruise ship. But here you have two separate incidents, one of which clearly identifies him by name, which documents precisely what he's saying happened to him. And the I.J. doesn't bother to talk about it? And we're supposed to say that's okay? I don't think so. Mr. Ismail has not responded to the first finding the judge said, for example, about the beating in July 1999. And that was that Mr. Ismail testified it happened when he was working as a bartender in July 99. He served... I understand. So that's an incident where he lacks credibility, as you say. It could reasonably be interpreted one way or the other. And under the standard, does that compel us? No, it does not compel us. But then we have two other beatings, which are relatively close and consistent in time, as by your own statement, documented by the record of independent people. Now, we don't know who they are, and originally the judge expressed doubts. But then at the end of the day, they're in evidence. So what do we do with that? Just ignore it? Just say, well... It was within the immigration judge's authority to disregard some part of the evidence presented by you. Yes, but with some explanation. Some explanation. Why, on their face, they just... It seems of this dust up over the cruise ship July 99 beating when you've got two others that are documented. We would submit that for the other reasons given by the immigration judge, he doubted that the 1999 incident occurred at all. Therefore, it was really irrelevant if Mr. Ismail were able to produce a person, although he said he didn't know how the statement came into effect, he didn't ask them to do it. Did he articulate that specifically to the incident that had been corroborated? I'm sorry, I'm not... Did the IJ articulate that reason that he rejected specifically that bit of testimony which had been corroborated? Because he indicated he rejected it because of the other inconsistencies regarding the 1999 incident. He did. He just flat out rejected that incident. And then for the other reason that Mr. Ismail could not authenticate the statements in any way, shape, or form, there was no reason for the judge to consider them. Even though they're in evidence? Even though they're in evidence, absolutely. Well, we don't know whether the judge disregarded them because he didn't consider them authenticated. We don't know whether he disregarded them because, as you say, he'd already... That the July 99 blew his credibility as to everything, we don't know at all why the IJ or what weight he gave to it at all. But you've got two corroborated statements that are admitted into evidence. If they had been authenticated, as the immigration judge told the parties, he needed to have before he would even consider them. And that did not occur. Well, I don't know what consider means. When you put something in evidence, it's part of the record, and usually you expect the prior fact to deal with it in these contexts. At least I would, because we're so bereft of documentary or corroborated evidence, and here you have two statements by different people. It's quite troublesome that the IJ just ignored them. Well, and Petitioner's never challenged, and Mr. Ismail's never challenged the judge's requirement that the statements be tied to their translations. Well, I don't know why they should. They got admitted into evidence. But admitted into evidence, Your Honor, as you well know, it enables either party to argue about it. And to argue that it supports his case or that it doesn't support the other party's case. Are you saying that Ismail hasn't argued that they support his case? That's right. I would argue that in the way, in terms of being authenticated and established as evidence. Particularly the one that doesn't mention him by name, even though he said that individual was a friend of his family. Okay. All right. You've gone over time, so thank you very much. Your Honor, since I only have one minute, I'm just going to address the issue of the declarations. I'll give you a couple extra minutes, since we gave government counsel a couple extra minutes, too. Thank you. Your Honor is absolutely correct. The declarations were submitted into evidence. And whether or not. Where have you argued that those carry any weight? I don't believe that. Well, other than the fact that we have discussed in our briefs that Mr. Ismail's testimony was credible. And that the judge did not take into account all of the other testimony and the other incidents. I don't think we specifically addressed the declarations themselves. However, the IJ is under a requirement to take all of the evidence into account, and he didn't do that. I think we understand that. You indicated that there was no entry, that the only on-board, getting on-board ship stamp was the one from Greece. And I obviously misspoke on that, Your Honor.
judges: Gibson, Fisher, Callahan.